**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:11-cv-00301-MR-DLH**

| | |
|---|---|
| **JESSICA SIMPSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | <u>**MEMORANDUM OF**</u> |
| **vs.** ) | <u>**DECISION AND ORDER**</u> |
| ) | |
| ) | |
| **AMYLIN PHARMACEUTICALS, INC.,** ) | |
| **TODD BILLINGSLEY, DENISE** ) | |
| **PRINDIVILLE, and CAROLINE** ) | |
| **ESPREE,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for

Summary Judgment [Doc. 49].

## I.     PROCEDURAL BACKGROUND

The Plaintiff Jessica T. Simpson ("Plaintiff") initiated this action on

June 10, 2011 against the Defendant Amylin Pharmaceuticals, Inc.

("Amylin") by filing a Complaint in the Buncombe County General Court of

Justice, Superior Court Division, alleging that she was terminated from her

employment on the basis of her sex and because of her pregnancy, in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et*

*seq.* ("Title VII"), and in violation of North Carolina public policy.  [Doc. 1-2].

An Amended Complaint was filed on September 6, 2011, adding Amylin

employees Todd Billingsley ("Billingsley"), Denise Prindiville ("Prindiville"),

and Caroline Espree ("Espree") as defendants and asserting additional

claims for gross negligence and tortious interference with contract against

all named Defendants.  [Doc. 1-3].

On November 8, 2011, the Defendants removed the action to this

Court on the basis of federal question jurisdiction.  [Doc. 1].  Thereafter, the

Defendants moved to dismiss the Plaintiff's gross negligence claim.  [Doc.

3].  On April 9, 2012, the Magistrate Judge entered a Memorandum and

Recommendation recommending the dismissal of the gross negligence

claim.    [Doc.  7].    The  Court  adopted  the  Memorandum  and

Recommendation on August 7, 2012.  [Doc. 11].  Thereafter, the Court

entered a Pretrial Order and Case Management Plan, setting a deadline of

May 1, 2013 for the completion of all discovery and a deadline of June 1,

2013 for the filing of any dispositive motions, and setting this case for trial

during  the  November  2013  trial  term.    [Doc.  16].    The  discovery  and

motions deadlines were later extended to May 31, 2013 and June 14, 2013, respectively.[1] [Doc. 39].

On June 14, 2013, the Defendants filed the present Motion for Summary Judgment. [Doc. 49]. The Plaintiff filed her Response on July 1, 2013 [Doc. 56], and the Defendants filed their Reply on July 11, 2013 [Doc. 69]. The Court held an oral argument on the motion on August 30, 2013.

Having been fully briefed and argued, this matter is ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it

---

[1] The Plaintiff contends that the discovery period ended before she was able to scheduled and take the depositions of Alex Rhyne and Jennifer Pearson, two Eli Lilly employees who the Plaintiff alleges knew of her pregnancy as early as December 2009 and were in communication with Plaintiff's supervisors at Amylin. Because these depositions were not taken, the Plaintiff urges the Court to deny or defer the summary judgment motion "based on the refusal of Defendants' counsel to allow these depositions to go forward." [Doc. 56 at 17 n.6]. The Plaintiff's request is improper and the Court will not deny or defer ruling on the Defendants' summary judgment motion on this basis. The Plaintiff failed to seek any affirmative relief from the Court in order to compel these depositions during the discovery period. Moreover, the Plaintiff never sought leave from the Court to take these depositions outside of the discovery period. To the extent that the Plaintiff's argument, which is buried in a lengthy footnote in her response brief can even be construed as such a request, it is denied.

3

"might affect the outcome of the case." News and Observer Pub. Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.  FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

The Plaintiff was employed as a pharmaceuticals sales representative by Amylin from April 2005 through her termination in February 2010.  [Amended Complaint, Doc. 1-3 at ¶¶10, 40; Simpson Dep., Doc. 51-2 at 21].  Amylin researches, develops and markets pharmaceuticals aimed primarily at the treatment of diabetes.  [Amended Complaint, Doc. 1-3 at ¶2].  While an Amylin employee, the Plaintiff received annual performance reviews in which her work was consistently rated as acceptable overall.  [See Simpson Aff., Doc. 57 at ¶2].

The Plaintiff had her first child, a daughter, in August 2008 while in the employ of Amylin.  [Simpson Dep., Doc. 51-2 at 35].  She used FMLA leave (the first two weeks of which were paid leave in accordance with Amylin policy) for the birth of her daughter without any issues and returned to work twelve weeks later.  [Id. at 35-39].

In the summer of 2009, Defendant Todd Billingsley became Plaintiff's District Manager after Amylin experienced substantial layoffs.  [Id. at 26].  Defendant Denise Prindiville was Amylin's Regional Director and Plaintiff's

"one-over" manager. [Simpson Dep., Doc. 51-2 at 48; Prindiville Dep., Doc. 51-4 at 17].

For the first quarter of 2009, the Plaintiff ranked 25th in sales among the 80 Amylin sales representatives in her region. For the second quarter of 2009, she ranked 44th in sales among the 80 sales representatives. For the third quarter of 2009, she ranked 62nd overall. [Prindiville Dep., Doc. 66 at 136-46, 329-35; Billingsley Dep., Doc. 65 at 52-60, 67-75]. In her annual performance review for 2009, Billingsley stated that the Plaintiff had a "decent sales year" and gave her an overall acceptable rating. The only area ranked as less than acceptable was the timeliness of her submissions to the Lighthouse system, a computerized program in which the sales representatives entered information about their calls on physicians. [Billingsley Dep., Doc. 65 at 124-25].

### A.    The Events of January 12, 2010

On January 12, 2010, Plaintiff met Eli Lilly Sales Representative Jennifer Pearson for breakfast at the Cracker Barrel restaurant on Smokey Park Highway. [Simpson Dep., Doc. 51-2 at 101]. The breakfast ended at about 10:15 or 10:30 a.m. [Id. at 102]. The Plaintiff had previously arranged to take lunch to a medical practice in Morganton about 90 minutes away. [Id. at 102-03]. The Plaintiff testified that she generally gets

to offices for lunches by 11:30 a.m.  [Id. at 119].  The Plaintiff decided not to drive to Morganton to deliver lunch because it was snowing at the Cracker Barrel.  [Id. at 102-03, 105-06, 108-09].  The Plaintiff, however, admittedly did not check any weather reports or otherwise assess the condition of the roads leading to Morganton.[2]  Earlier in the month, Billingsley had sent an email to the employees he supervised regarding traveling in inclement weather.  That email provided "…if you are concerned, if the schools are closed in your area, and roads are hazardous… please do not drive."  [Id. at 108, Simpson Dep. Ex. 1, Doc. 51-2 at 77; Billingsley Dep., Doc. 51-5 at 135].  There was no inclement weather in Morganton that day.  [Billingsley Dep., Doc. 51-5 at 191].

Instead of proceeding to Morganton as planned, the Plaintiff called Asheville Diabetes and Endocrinology Center ("Asheville Endo") at 10:16 a.m. and asked the office manager if she could deliver lunch to them instead.  [Simpson Dep., Doc. 51-2 at 109, 118, 137].  At 10:37 a.m. she called the medical practice in Morganton to cancel her noon lunch appointment. [Id. at 109, 113-14, 137].  The Plaintiff did not inform anyone

---

[2] Plaintiff's counsel subsequently produced records from the National Climatic Data Center show that it snowed at the Asheville airport from approximately 8:54 a.m. to 11:16 a.m. that day, with .20 inches of precipitation recorded.  [See NCDC Records attached to Shults Aff., Doc. 58].

with Amylin of her change in plans as she had done earlier in the month when it snowed. [Id. at 110; Simpson Dep. Ex. 74, Doc. 51-3 at 43].

Thereafter, the Plaintiff drove from Cracker Barrel to Mosaic Café arriving sometime between 10:30 and 11:00 a.m. [Simpson Dep., Doc. 51-2 at 114]. The food, however, was not yet ready. [Id. at 337]. The Plaintiff claims that she left Mosaic at approximately 11:30 a.m. to go to Asheville Endo, which was just a few minutes away, and that she remained at Asheville Endo for the next three hours. [Id. at 115-16, 125]. Plaintiff's Mosaic receipts have time stamps of 11:32 a.m. and noon. [Simpson Dep. Exs. 2 and 3, Doc. 51-2 at 78-79]. The Plaintiff further claims that she left Asheville Endo about 2:40 p.m. and arrived home around 2:40 or 2:45. [Id. at 130].

### B.   Amylin's Concerns Regarding Plaintiff

Billingsley had concerns about the Plaintiff's performance long before anyone at Amylin knew she was pregnant. [Prindiville Dep., Doc. 51-4 at 153-54]. The Plaintiff was not only ranked toward the bottom of her region in sales, but her sales call reporting on Amylin's Lighthouse call tracking program raised suspicions about her work ethic and caused Billingsley to question whether the Plaintiff was spending full days in the field as required. [Prindiville Dep., Doc. 51-4 at 108, 154-55, 171-72, 204-05;

Simpson Dep. Ex. 10, Doc. 51-3 at 1]. Pursuant to Amylin policy, calls were to be reported through the Lighthouse system two to three times a week. The Plaintiff, however, failed to submit her calls until late into the month on numerous occasions. [Billingsley Dep., Doc. 51-5 at 122]. The Plaintiff was under consideration for a performance improvement plan in early 2010 in part for not entering her calls on physicians in the Lighthouse system on a timely basis. [Id. at 44-47; Prindiville Dep., Doc. 51-4 at 114].

On January 12, 2010, Billingsley traveled to Asheville from Johnson City, Tennessee in anticipation of meeting with the Plaintiff the next day in order to discuss her 2010 business plan. [Billingsley Dep., Doc. 51-5 at 141-42,149-50]. Since he suspected that the Plaintiff was not working full days in the field, Billingsley decided to stop by her home to see if she was there instead of in the field. [Id. at 149; Prindiville Dep., Doc. 51-4 at 152]. He did not encounter any snow or wet weather and arrived in Asheville to find that schools were open and that the roads were dry.[3] [Billingsley Dep.,

---

[3] Prindiville and Espree also testified that they subsequently checked weather reports online and did not see any reports of snow in Asheville. [Prindiville Dep., Doc. 51-4 at 179-80; Espree Dep., Doc. 51-6 at 153-54].

9

Doc. 51-5 at 141-43, 211-12; Prindiville Dep., Doc. 51-4 at 179]. At that time, Billingsley had no knowledge that Plaintiff was pregnant.[4]

At approximately 2:00 to 2:30 p.m., Billingsley drove by the Plaintiff's home in an attempt to determine whether she was working in the field. [Billingsley Dep., Doc. 51-5 at 160; Simpson Dep. Exs. 10, 82, Doc. 51-3 at 1, 46]. When he arrived, Billingsley observed that Plaintiff's garage door was open and that her company-issued car was parked in the garage. [Billingsley Dep., Doc. 51-5 at 159]. At 2:32 p.m., Billingsley called the Plaintiff to ask her where she was. [Id. at 158]. The Plaintiff responded that she was at a lunch at Asheville Endo and that she would call him back. [Simpson Dep., Doc. 51-2 at 144]. At the time Billingsley called, the Plaintiff was actually talking on the phone with a friend she had talked to several times earlier that day. [Simpson Dep., Doc. 51-2 at 144]. After concluding her call, the Plaintiff called Billingsley back and again repeated

---

[4] In December 2009, the Plaintiff had told Alex Rhyne, an employee of Eli Lilly, with whom she had in the past co-promoted drugs, that she was pregnant with her second child. [Simpson Dep., Doc. 51-2 at 88-90]. The Plaintiff told Rhyne about her pregnancy because "she knew that we [Amylin] were going to be leading up to a [drug] launch,…" [Id. at 92]. The Plaintiff also told Jennifer Pearson, another Eli Lilly employee, that she was pregnant sometime in December 2009 or January 2010. [Id. at 93]. While the Plaintiff suspects that either Rhyne or Pearson told someone at Amylin about her pregnancy, the Plaintiff admitted that she has no evidence to support this suspicion. [Id. at 93-94]. The Defendants, on the other hand, affirmatively deny that Prindiville or Billingsley had any conversations with anyone at Eli Lilly regarding the Plaintiff prior to her termination. [Prindiville Dep., Doc. 51-4 at 340].

to him that she was at Asheville Endo. [Id. at 144-45]. She told Billingsley that she had been scheduled to bring lunch to a medical office in Morganton, but changed her plans because she did not want to drive in the bad weather. [Id.].

At approximately 2:43 p.m., Billingsley sent a text message to Prindiville to inform her that he believed the Plaintiff was at home and not working in the field as required and as she had represented. [Prindiville Dep., Doc. 51-4 at 169-70]. He also called Amylin Human Resource Business Partners Julie Judd and Caroline Espree to report his findings. [Billingsley Dep., Doc. 51-5 at 156, 172-73; Espree Dep., Doc. 51-6 at 82-83; Simpson Dep. Ex. 40, Doc. 51-3 at 5]. Finally, at approximately 3:24 p.m., he called Asheville Endo to inquire whether the Plaintiff had been there and was told by a woman named Betsy that the Plaintiff had "dropped off" lunch because she said there was bad weather and did not want to waste the food. [Billingsley Dep., Doc. 51-5 at 174-77]. Billingsley remained in view of the Plaintiff's home until 4:15 p.m. Her garage door was closed at approximately 3:00 p.m., and no cars arrived at or departed from the home between 2:00 p.m. and 4:15 p.m. [Id. at 165, 182, 184; Simpson Dep. Ex. 10, Doc. 51-3 at 1].

On January 13, 2010, Billingsley and the Plaintiff met in Asheville as scheduled to discuss her business plan. [Simpson Dep., Doc. 51-2 at 149; Billingsley Dep., Doc. 51-5 at 190; Simpson Dep. Ex. 10, Doc. 51-3 at 1]. During this meeting, she described her visit to Asheville Endo the previous day and gave a detailed account of her purported discussions with Dr. Dodd, a leading endocrinologist at Asheville Endo. [Simpson Dep., Doc. 51-2 at 155]. She stated that she had discussed one of Amylin's drugs with him and that he had agreed to participate in an Amylin speaker program. [Id. at 155-56]. It was during this meeting that the Plaintiff informed Billingsley that she was pregnant. [Id. at 150; Billingsley Dep., Doc. 51-5 at 190]. Because he needed to consult further with Prindiville and Espree, Billingsley did not ask the Plaintiff about her apparent misrepresentations to him. [Billingsley Dep., Doc. 51-5 at 194, 264-65]. He did, however, confirm certain facts with her, including that her nanny lived next door and her husband drove a Jeep, to ensure that no one else had a car like hers that would have been parked in the garage at 2:00 p.m. the prior day. [Id. at 192]. Billingsley informed Espree of his conversation. [Espree Dep, Doc. 51-6. at 131-36].

Billingsley followed up their meeting with a Field Activity Report that he sent to the Plaintiff. [Simpson Dep., Doc. 51-2 at 165; Simpson Dep. Ex

11, Doc. 51-2 at 83]. The Plaintiff considered this report to be negative in that Billingsley stated in the report that she needed to come up with clearer goals for 2010 and also when considered "in context" with an email that Billingsley sent Plaintiff wherein he noted that she had yet to enter any Lighthouse calls for the year. [Simpson Dep., Doc. 51-2 at 165, 169-70, 265; Simpson Dep. Ex. 6., Doc. 51-2 at 80]. In that same email, Billingsley asked her why she had apparently not requested any drug samples in some time. [Id.]. This inquiry was based on a report generated by a third party vendor. [Simpson Dep., Doc. 51-2 at 171-72, 265]. In response to Billingsley's email, the Plaintiff entered her Lighthouse calls for the year. The Plaintiff further stated in a reply email that she had requested drug samples back in December and that she was resubmitting her request. [Simpson Dep. Ex. 6, Doc. 51-2 at 80].

### C. Plaintiff's Inconsistent Explanations

Plaintiff reported in Lighthouse that she made six sales calls on January 12, 2010 at Asheville Endo. [Simpson Dep. Ex. 44, Doc. 51-3 at 7-37]. She reportedly called on Nurse Practitioner McGlamery-Pickens and Drs. Cumbie, Bernstein, Speed, Hester and Dodd. [Id.]. With the exception of Bernstein, she called on all of these professionals again only two days later, on January 14, 2010. [Id.].

On January 25, Billingsley called Asheville Endo to confirm which practitioners were present on January 12. [Billingsley Dep., Doc. 51-5 at 258; Simpson Dep. Ex. 44, Doc. 51-3 at 7-37]. Billingsley was informed by the operator that everyone was in except for Nurse Practitioner McGlamery-Pickens. [Billingsley Dep., Doc. 51-5 at 228-29, 258].[5]

On January 28, 2010, Billingsley and Prindiville met with the Plaintiff at the Hilton in Biltmore Park to ask her about her conduct and her Lighthouse call entries for January 12 and 14. [Simpson Dep., Doc. 51-2 at 174-75; Billingsley Dep., Doc. 51-5 at 244; Simpson Dep. Ex. 21, Doc. 51-3 at 3]. During the meeting, Plaintiff explained that she brought lunch to Asheville Endo on January 12, rather than to the office in Morganton, because of bad weather. She stated that she had a child and was pregnant and did not want to drive in the weather. This was the first time that Prindiville had heard about the Plaintiff's pregnancy. [Prindiville Dep., Doc. 51-4 at 194-95]. Prindiville told the Plaintiff that she did not consider her pregnancy the least bit relevant to the issues under discussion. [Prindiville Dep., Doc. 51-4 at 195, 257-58; Simpson Dep. Ex. 21, Doc. 51-3 at 3].

---

[5] The Plaintiff has presented a forecast of evidence that this, in fact, was not true, as McGlamery-Pickens was scheduled to work on January 12, and did see patients that day. [Walker Aff., Doc. 61 at ¶3].

The Plaintiff stated that she made sales calls on all of the individuals she listed in Lighthouse for January 12, including Dr. Dodd. [Simpson Dep., Doc. 51-2 at 317; Simpson Dep. Ex. 44, Doc. 51-3 at 7-37]. She again described the discussions that she allegedly had with Dr. Dodd including that he had committed to conduct an Amylin program. Despite her call entries, the Plaintiff admitted that she had only said a "quick hello" to two doctors she entered in Lighthouse, Drs. Cumbie and Bernstein. [Simpson Dep. Ex. 21, Doc. 51-3 at 3].[6]

Billingsley and Prindiville also asked the Plaintiff about her sales calls on January 14, which were nearly identical to her January 12 calls, and did not include calls to any other medical offices. [Simpson Dep., Doc. 51-2 at 183-84; Billingsley Dep., Doc. 51-5 at 266; Simpson Dep. Ex. 21, Doc. 51-3 at 3]. The Plaintiff could not explain her seemingly duplicative entries. [Simpson Dep., Doc. 51-2 at 183-84]. She admitted that "it looked bad," and stated that she could not remember why she made the same calls or if she visited any other offices that day. [Id. at 185; Prindiville Dep., Doc. 51-

---

[6] Plaintiff now maintains that she had a "quick conversation" with the two. [Simpson Dep., Doc. 51-2 at 338]. Under Amylin policy, simply saying "hello" does not meet the definition of a sales call. [Simpson Dep. Ex. 50, Doc. 51-3 at 40]. Rather, as the Plaintiff acknowledged, a sales call requires discussion of Amylin products. [Billingsley Dep.. Doc. 51-5 at 259; Simpson Dep. Ex. 21, Doc. 51-3 at 3].

4 at 261-62]. Billingsley felt the calls were redundant and that it was odd that the Plaintiff could recall details of her calls on January 12 but not those of January 14. [Billingsley Dep., Doc. 51-5 at 266-67].

The Plaintiff was given numerous opportunities during the meeting to check her notes and provide additional information about her activities on January 12 and 14. [Simpson Dep., Doc. 51-2 at 185-86; Prindiville Dep., Doc. 51-4 at 245; Simpson Dep. Ex. 21, Doc. 51-3 at 3]. She confirmed that everything she said during the meeting and had entered in Lighthouse was correct. [Simpson Dep., Doc. 51-2 at 186-87]. The Plaintiff was placed on administrative leave pending further investigation. [Billingsley Dep., Doc. 51-5 at 276].

Plaintiff subsequently spoke to Espree and told her that she had made a "mistake" and had not actually seen Dr. Dodd on January 12 as she had repeatedly represented, but rather saw Dr. Russell. [Simpson Dep., Doc. 51-2 at 189-90, 317; Simpson Dep. Ex. 81, Doc. 51-3 at 44; Espree Dep., Doc. 51-6 at 273-74]. The Plaintiff, however, never corrected her Lighthouse report. [Espree Dep., Doc. 51-6 at 274]. Also, her "quick hello" to Drs. Cumbie and Bernstein on January 12, became a "stand up call" when speaking with Espree. [Simpson Dep., Doc. 51-2 at 190-91].

The Plaintiff's story with respect to January 14 also changed. Although the Plaintiff had no recollection of what she did that day when she spoke with Billingsley and Prindiville the day before, she told Espree that she made sales calls and dropped off samples at Asheville Endo and also visited several other medical offices that day to drop off samples and program invitations. [Simpson Dep., Doc. 51-2 at 191, 200; Simpson Dep. Ex. 44, Doc. 51-3 at 7-37; Espree Dep., Doc. 51-6 at 282]. She also told Espree she had a standing appointment on Thursdays with Asheville Endo – something she had failed to mention earlier when meeting with Billingsley and Prindiville. [Simpson Dep., Doc. 51-2 at 318]. If, however, the Plaintiff had only dropped off samples as she claimed she had, she did not record the sample drop off accurately in her Lighthouse call report. [Billingsley Dep., Doc. 51-5 at 266].

Following her interview with Plaintiff, Espree followed up with Billingsley and Prindiville. Prindiville also spoke with Todd Snook, acting Vice President of Sales, to make him aware of the situation. [Prindiville Dep., Doc. 51-4 at 233]. Based on the Plaintiff's shifting stories, apparent misrepresentations and other violations of Amylin policy, Billingsley and Prindiville decided to terminate the Plaintiff's employment and, with Espree, called the Plaintiff to inform her of Amylin's decision. [Billingsley Dep., Doc.

51-5 at 275-76]. During the call, the Plaintiff stated that she could submit evidence proving that she had not made any misrepresentations to Amylin. [Simpson Dep., Doc. 51-2 at 198-99]. The Plaintiff was instructed to send any evidence she had so that it could be considered. She was further informed that her administrative leave would continue. [Simpson Dep., Doc. 51-2 at 199].

Subsequently, the Plaintiff sent Espree documentation from Asheville Endo, including a statement from McGlamery-Pickens confirming her meeting with the Plaintiff on January 12 and an email from the office manager Edith Walker, stating that the Plaintiff was at Asheville Endo on January 12 for three hours, until approximately 2:30 p.m. [Simpson Dep. Ex. 44, Doc. 51-3 at 7-37]. Espree reviewed the Plaintiff's information, and all of the information Amylin had gathered during the investigation. [Simpson Dep. Ex. 82, Doc. 51-3 at 46]. Based on all of the information available to it, Amylin concluded that Plaintiff had made misrepresentations and otherwise violated company policy and therefore made the decision to terminate the Plaintiff's employment effective February 2, 2010. [Simpson Dep. Exs. 44 and 49, Doc. 51-3 at 7-37, 38; Prindiville Dep., Doc. 51-4 at 269, 279]. The Plaintiff's position was eventually filled by David Jones, who

was recommended to Billingsley by Mountain Diabetes and Jennifer Pearson. [Billingsley Dep., Doc. 51-5 at 304].

## IV.  DISCUSSION

### A.  Pregnancy/Sex Discrimination Claim under Title VII

Title VII provides that an employer shall not "discriminate against any individual ... because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), expanded the scope of discrimination based on "sex" to include discrimination on the basis of pregnancy. Accordingly, a pregnancy discrimination claim is analyzed in the same manner as any other sex discrimination claim under Title VII.  Young v. United Parcel Serv., Inc., 707 F.3d 437, 445-46 (4th Cir. 2013), pet. for cert. filed Apr. 8, 2013; DeJarnette v. Corning Inc., 133 F.3d 293, 297 (4th Cir.1998).

The Court first must determine whether the Plaintiff has presented a forecast of any direct evidence of discrimination.  Young, 707 F.3d at 446. In the absence of any direct evidence of discrimination, the Court applies the familiar burden shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Regardless of the analytical framework applied, the plaintiff has "the ultimate burden of persuading the court that she has been the victim of intentional

discrimination." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981); DeJarnette, 133 F.3d at 297.

In the present case, the Plaintiff points to no direct evidence of pregnancy or sex discrimination. Therefore, the Court will analyze Plaintiff's claim under the McDonnell Douglas framework. Under McDonnell Douglas, a Title VII plaintiff must show: "(1) she is a member of a protected class; (2) she suffered [an] adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005) (quoting Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to "produce a legitimate, non-discriminatory reason for the termination." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 513-14 (4th Cir. 2006). "The employer's burden at this stage 'is one of production, not persuasion; it can involve no credibility assessment.'" Id. at 514 (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000)). If the defendant meets its

burden of production, then the presumption created by the prima facie case is rebutted and "drops from the case."  <u>Burdine</u>, 450 U.S. at 255 n. 10.

Once the employer satisfies its burden, the burden then shifts to the plaintiff to show that the defendant's proffered reason is pretextual. <u>Reeves</u>, 530 U.S. at 143.  The plaintiff may prove pretext "either by showing that [the employer's] explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [unlawful] discrimination."  <u>Mereish v. Walker</u>, 359 F.3d 330, 336 (4th Cir. 2004).  At this stage, the plaintiff's burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination."  <u>Burdine</u>, 450 U.S. at 256.  Although the burden of production shifts between the parties, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Burdine</u>, 450 U.S. at 253.

In reviewing a defendant's articulated reasons for a plaintiff's discharge, the Court is ever mindful that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer."  <u>DeJarnette</u>, 133 F.3d at 298-99 (quoting <u>Jimenez v. Mary Washington College</u>, 57 F.3d 369, 377 (4th Cir. 1995)).  As such, the Court "does not sit as a kind of super-personnel department weighing the prudence of employment

decisions made by firms charged with employment discrimination...." DeJarnette, 133 F.3d at 299 (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997)). Rather, the Court's concern is whether the plaintiff has provided "enough evidence upon which a reasonable jury could find that the termination was actually motivated by the pregnancy." Zeuner v. Rare Hospitality Int'l, Inc., 338 F.Supp.2d 626, 640 (M.D.N.C. 2004).

Turning to the elements of the prima facie case, there is no apparent dispute on the record that the Plaintiff was a member of a protected class, both with respect to her sex and her pregnancy,[7] that she suffered an adverse employment action, or that her position was filled by a similarly qualified applicant outside the protected class. Moreover, the Plaintiff's forecast of evidence, when viewed in the light most favorable to her, establishes that she was performing her job duties at a level that met her

---

[7] In Sweeney v. Marc Global, Inc., this Court held that "a plaintiff in a pregnancy discrimination case must present evidence that the employer had *actual* knowledge of her pregnancy at the time the adverse employment decision was made in order to satisfy the first element of the prima facie case." No. 3:06-cv-00182-MR-DLH, 2008 WL 313618, at *10 (W.D.N.C. Feb. 4, 2008) (unpublished) (citing Prebilich-Holland v. Gaylord Entertainment Co., 297 F.3d 438, 443-44 (6th Cir. 2002); Clay v. Holy Cross Hosp., 253 F.3d 1000, 1007 n.7 (7th Cir. 2001); Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)). Here, the forecast of evidence presented by the Plaintiff suggests that Billingsley and Prindiville were aware of the Plaintiff's pregnancy at least by the time that the adverse employment decision was made.

employer's legitimate expectations at the time of the adverse employment action.

As the Plaintiff has presented a prima facie case, the burden of production now shifts to Amylin to present a legitimate, non-discriminatory reason for the Plaintiff's discharge. The Defendant has satisfied that burden here. Specifically, Amylin has presented a forecast of evidence to establish that at the time of the Plaintiff's termination, the Defendants reasonably believed: (1) that she had entered duplicative call entries for January 12 and 14 and had failed to enter calls to any other medical offices on those dates; (2) that she had falsified her sales call entries by stating she had seen Drs. Dodd, Cumbie and Bernstein on January 12 when she had not seen Dodd and had said only "quick hellos" to Cumbie and Bernstein; and (3) that she misrepresented to Billingsley that she was at Asheville Endo on the afternoon of January 12 when, in fact, he saw her car parked at her residence. In short, Amylin has offered creditable, legitimate, and nondiscriminatory reasons that are more than sufficient to justify its decision to terminate the Plaintiff's employment.

Having determined that Amylin has satisfied its burden of production, the Court must now determine whether the Plaintiff is able to demonstrate that Amylin's justification for terminating her was a pretext for

discrimination. In this regard, the Plaintiff contends that her forecast of evidence demonstrates that the reason advanced by Amylin for her discharge (namely, call falsification) was untrue. She further contends that a thorough investigation of the circumstances would have revealed that the allegation of call falsification was simply untrue, but that Amylin failed to conduct any such investigation.

Whether Amylin's investigation could have been more thorough or was otherwise flawed is not relevant, and the Plaintiff's subjective beliefs in this regard are insufficient to establish pretext. "Whether a termination decision was wise or done in haste is irrelevant, so long as the decision was not made with discriminatory animus." Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003). In assessing pretext, the Court must focus "on the perception of the decision maker, that is, whether the *employer believed* its stated reason to be credible . . . ." Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006) (internal quotation marks and citations omitted) (emphasis added). Thus, it is not enough for the Plaintiff to impugn the veracity of the employer's justification; rather, she has to "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a *sham intended to cover up* the

employer's real and unlawful motive of discrimination." Id. (emphasis added).

In arguing that that her forecast of evidence is sufficient to cast doubt on the veracity of Amylin's proffered reason for her termination, the Plaintiff relies upon the following passage from St. Mary's Honor Center v. Hicks:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . .

509 U.S. 502, 511 (1993). As the Supreme Court later cautioned, however,

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, *or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.* To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that

> trial courts should not treat discrimination differently
> from other ultimate questions of fact.

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (emphasis added) (internal quotation marks and citations omitted). In the present case, the Plaintiff's forecast of evidence creates, at most, the kind of "weak issue of fact" referenced by the Reeves Court, especially when such evidence is considered in light of the other "abundant and uncontroverted evidence" presented by the Defendant, which establishes that the Plaintiff entered duplicative sales calls to Asheville Endo with admittedly inconsistent explanations; that she changed her story about whether she actually met with Dr. Dodd; that she falsified sales call entries; and that Billingsley observed her car parked in her garage on January 12 during a phone call when she misrepresented that she was at a doctor's office. The Plaintiff has been unable to articulate what evidence in the record tends to show that these facts are offered as a cover up of an unlawful and discriminatory reason for the Plaintiff's dismissal. For these reasons, the Court concludes that Amylin is entitled to summary judgment with respect to the Plaintiff's Title VII claim.

**B.    Wrongful Discharge in Violation of North Carolina Public Policy**

Along with her federal claim of discrimination, the Plaintiff asserts a claim for wrongful termination in violation of public policy, <u>see</u> N.C. Gen. Stat. § 143-422.2.  It is unclear from the Plaintiff's Amended Complaint as to whether she is arguing that she was wrongfully discharged in violation of public policy due to her pregnancy or simply because of her sex.  In her brief filed in response to the motion for summary judgment, the Plaintiff appears to limit this claim only to a claim of pregnancy discrimination.  [<u>See</u> Doc. 56 at 15 n.3].

To the extent that the Plaintiff's state law claim is an assertion of discrimination based on her sex, the Plaintiff's claim must fail for the reasons stated <u>supra</u>.  To the extent that this state law claim is an assertion of discrimination based on her pregnancy, this claim also fails.  The North Carolina Equal Employment Practice Act is a statement of North Carolina's public policy against "discrimination . . . on account of race, religion, color, national origin, age, sex or handicap…."  N.C. Gen. Stat. § 143-422.2.  "To date, no North Carolina court has addressed whether this statutory provision encompasses a claim of pregnancy discrimination."  <u>Sweeney v. Marc Global, Inc.</u>, No. 3:06-cv-00182-MR-DLH, 2008 WL 313618, at *11

(W.D.N.C. Feb. 4, 2008). Assuming that the North Carolina courts would recognize such a claim, it would likely be analyzed in the same manner as a Title VII claim. Id.; Blount v. Carlson Hotels, Inc., No. 3:11-cv-00452-MOC-DSC, 2012 WL 1021735, at *8 (W.D.N.C. Mar. 1, 2012), report and recommendation adopted, 2012 WL 1019507 (W.D.N.C. Mar. 26, 2012).

Because the Court has determined that the Plaintiff has failed to establish facts to support her claim that Amylin terminated her due to her pregnancy, the Plaintiff's pregnancy discrimination claim under N.C. Gen. Stat. § 143-422.2 – to the extent that such a claim even exists – must also be dismissed. See Knezevic v. Hipage Co., 981 F.Supp. 393, 397 (E.D.N.C.) (holding pregnancy discrimination claim under § 143-422.2 "must suffer the same fate" as plaintiff's Title VII claim), aff'd, 129 F.3d 1259 (4th Cir. 1997). Accordingly, the Plaintiff's claim for wrongful discharge in violation of public policy is dismissed.

### C. Tortious Interference with Contract

In order to prevail on a tortious interference with contract claim under North Carolina law against Defendants Billingsley, Prindiville, and Espree, the Plaintiff must show: (1) that the Plaintiff had a valid contract of employment with Amylin; (2) that the individual Defendants knew about the contract; (3) that the individual Defendants intentionally induced Amylin to

28

terminate her employment; (4) that the individual Defendants acted without any no business justification for doing so; and (5) that the actions of the individual Defendants caused the Plaintiff actual damages.  See Bloch v. Paul Revere Life Ins. Co., 143 N.C. App. 228, 239, 547 S.E.2d 51, 59, disc. rev. denied, 354 N.C. 67, 553 S.E.2d 35 (2001).

The individual Defendants do not contest that the Plaintiff was working with Amylin through an oral, at-will employment "contract" and that they knew about this contract.  Accordingly, for purposes of this motion, the Court will assume that the first and second elements have been met.  The Plaintiff, however, fails to present a forecast of evidence to show that the individual Defendants intentionally induced Amylin to terminate her employment without any business justification.  The Plaintiff has offered no evidence beyond her own speculation to establish these elements.

Whether a defendant was justified in interfering with a plaintiff's contract depends upon "'the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor, and the contractual interests of the other party.'"  Robinson, Bradshaw & Hinson, P.A. v. Smith, 129 N.C. App. 305, 317-18, 498 S.E.2d 841, 850, disc. rev. denied, 348 N.C. 695, 511 S.E.2d 649 (1998) (quoting Peoples Security

Life Ins. Co. v. Hooks, 322 N.C. 216, 221, 367 S.E.2d 647, 650, <u>reh'g denied</u>, 322 N.C. 486, 370 S.E.2d 227 (1988)). "A defendant may be justified in interfering with a contract if he does so 'for a reason reasonably related to a legitimate business interest.'" <u>Bloch</u>, 143 N.C. App. at 240, 547 S.E.2d at 60 (quoting <u>Robinson, Bradshaw & Hinson</u>, 129 N.C. App. at 318, 498 S.E.2d at 850.

Generally speaking, "'non-outsiders' [to an employment contract] often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." <u>Lenzer v. Flaherty</u>, 106 N.C. App. 496, 513, 418 S.E.2d 276, 286, <u>disc. review denied</u>, 332 N.C. 345, 421 S.E.2d 348 (1992). This qualified immunity is lost, however, "if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with." <u>Bloch</u>, 143 N.C. App. at 240, 547 S.E.2d at 60 (quoting <u>Lenzer</u>, 106 N.C. App. at 513, 418 S.E.2d at 286). In order to hold a "non-outsider" liable for tortious interference with contract, then, a plaintiff must establish that the defendant acted with legal malice, <u>i.e.</u>, without any legal justification for his or her actions. <u>Bloch</u> 143 N.C. App. at 240, 547 S.E.2d at 60.

In the present case, Billingsley was Plaintiff's immediate supervisor. In that capacity, he was obligated to monitor her performance, note

deficiencies, and communicate those deficiencies to her. In connection with these duties, Billingsley undertook to confirm his suspicions that Plaintiff was not spending the required full days in her territory when, on January 12, he decided to check on her whereabouts. Having concluded that Plaintiff was, in fact, at home rather than at Asheville Endo as she represented, he appropriately contacted Denise Prindiville, the Regional Manager, to report his concerns. It was also appropriate for him to consult with Carolina Espree and Julie Judd, Amylin's Human Resource Business Partners. In fact, the Plaintiff agreed that it was part of the individual Defendants' jobs to question about calls that were thought to be improper, and that it was part of Espree's job to investigate performance issues. [Simpson Dep., Doc. 51-2 at 194-95, 209].

In short, the Plaintiff has failed to present a forecast of evidence to suggest that the individual Defendants intentionally induced Amylin to terminate Plaintiff's employment without business justification or that it was done with malice. Accordingly, the Plaintiff's tortious interference claim fails and the individual Defendants are entitled to summary judgment on this claim.

The Plaintiff also asserts a tortious interference with contract claim against Amylin, under the theory that Amylin ratified the tortious conduct of

the individual Defendants by terminating her employment. Even if the Plaintiff could sustain a claim for tortious interference against one of the individual Defendants, which the Court has concluded she cannot, the Plaintiff has failed to cite any authority to support holding a corporation liable for tortious interference *with its own contract.* For these reasons, the Plaintiff's claim against Amylin for tortious interference with contract is also dismissed.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 49] is **GRANTED**, and this case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

Signed: October 2, 2013

Martin Reidinger
United States District Judge